# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 06-4120

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Nebraska. |
| | * | |
| Amalia Grajeda, | * | [PUBLISHED] |
| | * | |
| Appellant. | * | |

_____

Submitted: May 15, 2007
Filed: August 16, 2007

_____

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Following the district court's[1] denial of her motion to suppress the fruits of a vehicle search, Amalia Grajeda entered a conditional plea of guilty to possessing with intent to distribute 5 kilograms or more of cocaine or its isomers, in violation of 21

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, adopting the Report and Recommendation of David L. Piester, United States Magistrate Judge for the District of Nebraska.

U.S.C. § 841(a)(1) and (b)(1). The conditional plea preserved her right to appeal the denial of her motion to suppress, and she now argues that suppression was warranted because the search was tainted by a Fourth Amendment violation, which was not cured by her consent. We affirm.

Ms. Grajeda was a passenger in her white BMW X5 SUV, licensed in Nevada, and her aunt, Maria Mendez, was driving as they traveled east on Interstate 80 in February 2005. Nebraska State Patrol Trooper David Frye stopped them for a license plate violation of Nevada law, an obstructed rear view mirror in violation of Nebraska law, and driving over the white line. Trooper Frye approached the passenger side of the vehicle and noticed an overwhelming scent of air freshener when Ms. Grajeda rolled down the window. He obtained both of their drivers' licenses, the vehicle registration, and the insurance documentation for the vehicle and asked Ms. Mendez (the driver) to sit in the patrol car while he checked the documents. Ms. Grajeda remained in the passenger seat of the BMW, but Trooper Frye noticed her at one point hanging out the front window to look back at them and then moving all about in the parked BMW while he was speaking with Mendez in the patrol car. He considered her movements unusual and contacted another trooper for backup assistance.

Ms. Mendez and Ms. Grajeda each gave Trooper Frye slightly differing details regarding their travels, and they were vague about their destination. Through somewhat broken English, Ms. Mendez indicated that they were traveling to Iowa, though she did not know the name of the town or city, to meet Ms. Grajeda's boyfriend, who lived in Iowa, and that she would be returning home to Nevada on the following Monday. Trooper Frye left Ms. Mendez in his patrol car and went to ask Ms. Grajeda some questions from outside the BMW. Ms. Grajeda, who spoke English well, told him they were going to Iowa to meet her boyfriend's family and that her boyfriend, who lives in Las Vegas, would be flying to Iowa to join them at his family's home, though she also did not know the name of the town or city. She said she

planned to call for directions when they arrived in Iowa. She intended to stay in Iowa for three weeks and said that Ms. Mendez was along for the ride.

Trooper Frye then informed Ms. Grajeda that he was going to check the Vehicle Identification Number (VIN) number on the dashboard and the door. He looked through the front windshield on the driver's side to read the VIN located on the dashboard. Then he opened the driver's side door to read the VIN on the door frame or doorjamb, while continuing to converse with Ms. Grajeda who remained inside the vehicle. Crouching by the driver's opened door to read the number, he saw that the bolt securing the driver's seat "had a large amount of what appeared to be a recent scarring," as if it had been marked up by a ratchet used to remove and reinstall the seat. (Suppression Hrg. Tr. at 23.) Based on his training and experience, Trooper Frye knew that there was an empty compartment under the front seat of this particular vehicle model that is sometimes used to hide and transport illegal drugs.

At the conclusion of the traffic stop, Trooper Frye contacted a Spanish interpreter by telephone to speak to Ms. Mendez to ensure that she had understood why he had stopped her and that he was issuing only a warning ticket. At the completion of the traffic stop, she agreed to further questioning and consented to a search of items she owned that were located inside the vehicle. Ms. Grajeda, the vehicle's owner, also agreed to further inquiries. She denied possessing any illegal drugs and consented, both orally and in writing, to a search of the vehicle. Trooper Frye expressly informed Ms. Grajeda that she had the right to refuse consent. Ms. Grajeda confirmed her understanding and signed the consent form.

After beginning the search along the highway with another trooper, they determined that it would be necessary to remove the seats, and they asked Ms. Grajeda for permission to move the vehicle to a safer location at a nearby scale to complete the search. She agreed to permit the vehicle to be moved. Trooper Frye again requested and received consent before continuing the search with a drug dog. The dog alerted

to the presence of illegal drugs in the BMW, and packages containing suspected drugs were discovered hidden in the compartment under the front seats. Both women were arrested and charged in federal court.[2]

Ms. Grajeda moved to suppress the evidence seized from the vehicle, arguing that Trooper Frye engaged in an illegal search by opening the door to the BMW to view the VIN, when he in fact was interested in viewing the bolts holding the driver's seat to the floor to see if they had been tampered with. She also argued that her subsequent consent to search did not cure the violation. The district court, adopting the report and recommendation of the magistrate judge, denied the motion concluding that even if opening the door of the vehicle was an illegal search, the subsequent voluntary consent purged any resulting taint. Ms. Grajeda appeals after entering a conditional plea of guilty and receiving a sentence of 87 months of imprisonment.

Ms. Grajeda acknowledges that a motorist has no reasonable expectation of privacy in a vehicle's VIN, citing New York v. Class, 475 U.S. 106, 113-14 (1986) (Appellant's Br. at 6), but asserts that once the officer obtained the VIN by viewing it through the windshield, there was no legitimate reason for opening the door to view the number on the door fame. See Class, 475 U.S. at 119 ("If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it."); see also United States v. Caro, 248 F.3d 1240, 1247 (10th Cir. 2001) (holding there was no justification to search for an additional VIN inside the vehicle when the dashboard VIN matched the vehicle registration). She asserts that the videotape confirms Trooper Frye opened the door only to look at the seat bolts, not the VIN, and that this was an unjustified intrusion. She further argues that her subsequent consent to search did not cure that illegality.

---

[2]The federal indictment against Ms. Mendez was dismissed on the government's motion on May 16, 2006.

When reviewing a motion to suppress, we review the district court's factual findings for clear error, and "[w]e will affirm the denial of a suppression motion unless we find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." United States v. Donnelly, 475 F.3d 946, 951 (8th Cir.) (internal quotation marks omitted), cert. denied, 127 S. Ct. 2954 (June 11, 2007). Where the initial search is invalid, the fruit of that unlawful search must be suppressed, Wong Sun v. United States, 371 U.S. 471, 484 (1963), unless the evidence resulted from "an intervening independent act of a free will," id. at 486. We agree with the district court's conclusion that it is unnecessary to address whether the act of opening the door to view the VIN amounted to an illegal search because even assuming a Fourth Amendment violation, the subsequent search was validated by Ms. Grajeda's intervening voluntary consent. See United States v. McGill, 125 F.3d 642, 644 (8th Cir. 1997) (assuming a Fourth Amendment violation where the officer put his head into the vehicle through an open window to view a VIN but concluding that the subsequent consent validated the search), cert. denied, 522 U.S. 1141 (1998).

To determine whether an intervening consent to search "is sufficiently an act of free will to purge the primary taint" of a Fourth Amendment violation, id. (internal quotation marks omitted), we must consider factors in addition to the voluntariness inquiry, United States v. Becker, 333 F.3d 858, 861-62 (8th Cir. 2003). Even if consent is voluntary, we must also consider whether the defendant gave consent "in circumstances that render it an independent, lawful cause" of the discovery of contraband. Id. This inquiry turns on whether Ms. Grajeda "understood [her] right to withhold consent, the temporal proximity of [her] consent and the prior Fourth Amendment violation, the presence of intervening circumstances, 'and, particularly, the purpose and flagrancy of the official misconduct.'" McGill, 125 F.3d at 644 (quoting Brown v. Illinois, 422 U.S. 590, 604 (1975)); see also Becker, 333 F.3d at 862.

In this case, the request for consent to search followed closely but not immediately after the alleged Fourth Amendment violation, as approximately 20 minutes passed between the time when Trooper Frye opened the BMW door and when he first requested consent to search. Ms. Grajeda agreed to further questioning and consented to the search of the vehicle, both orally and in writing. Trooper Frye again asked for and obtained her consent to continue the search after they changed locations. He told Ms. Grajeda that she did not have to consent, but she signed the consent form and at no time attempted to interrupt the search or withdraw her consent. "Such an intervening circumstance supports the voluntariness of appellant's consent indicating that the trooper was not attempting to exploit an illegal situation." United States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002). It is clear from the record, and Ms. Grajeda does not argue otherwise, that she understood her right to withhold consent and that her consent was not coerced.

Ms. Grajeda argues that her uncoerced consent is outweighed by the flagrancy of the Fourth Amendment violation because Trooper Frye already had obtained the VIN through the windshield, and there was nothing suspicious about the identity of the vehicle to warrant cross-checking the numbers. While we are assuming a Fourth Amendment violation for purposes of this analysis, it is significant that we have never held that it is illegal for an officer to cross-check a VIN in both locations on a vehicle, and the Supreme Court has held that the VIN location on either the dashboard or the doorjamb is not "subject to a reasonable expectation of privacy." Class, 475 U.S. at 118.

Trooper Frye informed Ms. Grajeda that he would be checking both locations of the VIN, and she did not object. He was investigating a minor traffic violation, and his legitimate suspicions of possible drug transportation had been aroused by the answers to his questions concerning their travel and by the strong scent of air freshener coming from the vehicle. As he crouched outside of the vehicle to check the VIN, he was in close proximity to the seat bolt, which was then in plain view from his

position outside the vehicle. Trooper Frye "did not root about the interior" of the vehicle, id., or move anything to gain a better view of the VIN or the seat bolt other than simply opening the door. See id. (inferring in no uncertain terms that checking the doorjamb for a VIN is not an intrusion into the interior of a vehicle); see also United States v. Chavira, 467 F.3d 1286, 1289 n.1 (10th Cir. 2006) (stating that there is a violation only when the officer has verified the VIN from outside the passenger compartment but nevertheless physically enters the passenger compartment to check the VIN; no violation "if the officer remains physically outside the car when he examines the VIN"). There is no indication that Trooper Frye's view of the seat bolt influenced Ms. Grajeda's consent in any way. Thus, we conclude that the assumed violation was not flagrant.

The totality of the circumstances indicate that Ms. Grajeda's consent was an act of free will and an independent intervening cause of the discovery of contraband, sufficient to cure the taint of any prior Fourth Amendment violation.

Accordingly, we affirm the judgment of the district court.

_____